CHARLES W. HOTCHKISS *vs.* BON AIR COAL AND IRON COMPANY.

Kennebec.    Opinion February, 1911.

*Vendor and Purchaser.    Fraudulent Representations.    Mines and Minerals.    Trial.*
*Instructions.    Exceptions.    Contracts.    Rescission.    Evidence.*
*Revised Statutes, chapter 109, section 20.*

1.  In an action to recover back money which the plaintiff claims he was induced to pay by the false representations of the defendant, it is incumbent on the plaintiff to show that the representations were made intentionally, with the intent that he should act upon them, or in such a manner as would naturally induce him to act upon them ; that they were false, and were known by the defendant to be false, or being of matters susceptible of knowledge, were made as of a fact of his own knowledge ; that they were expressions of past or existing facts, and not expressions of opinion ; that they were material ; and that he relied upon them, was deceived, and was thereby induced to part with his money.

2.  When a representation is capable of being understood, either as an expression of opinion, or as a statement of a positive fact, whether it is to be regarded as the one or the other may depend upon the surrounding circumstances, and the question must be submitted to the jury with appropriate instructions.

3.  A representation that a tract of mining land contracted to be sold is solid or continuous, is material as a matter of law, if a want of continuity would materially affect the cost of mining, and therefore the value of the land. And under the circumstances of this case, it is deemed that the question of the continuity of ownership of the land contracted did materially affect the question of value.

4.  When the parties to a contract for the sale of coal bearing lands had in mind a coal which would produce coke suitable for smelting iron and to be sold in the Chicago market, and it appears that such a coal must contain less than one per cent of sulphur, a representation that the coal would compete or compare favorably with other specified coals in the Chicago market, which coals contain less than one per cent of sulphur, is to be construed as a representation that the coal in question contains less than one per cent of sulphur, and such a representation is material.

5.  Representations, in the sale of mining lands, as to the cost and profits of mining, as the business has been carried on, are material and actionable, and if false and fraudulent and relied upon, money, the payment of which was induced by them, may be recovered back.

6.  Statements made by the presiding Justice in his charge to the jury of the contentions of the parties are not rulings of law, and are not exceptionable.

7. The refusal of the presiding Justice to give a requested instruction which called for a ruling upon a question of fact is not exceptionable.

8. Exceptions to rulings which are not prejudicial will not be sustained.

9. There is no legal distinction between representations by an owner of the qualities of a thing which he proposes and agrees to sell at the option of a prospective purchaser, and similar representations made by him concerning the qualities of another thing which he agrees first to buy, and then to include in the sale to the same purchaser; and false representations respecting the qualities of the latter thing may be actionable.

10. What is a reasonable time within which the right of rescission of a contract must be exercised, when the facts are undisputed, is a question of law; but when the facts are in dispute, the question of reasonable time must be submitted to the jury with appropriate instructions.

11. When several alleged false representations are in question, an instruction to the jury that "you will be authorized to find that the rescission was made within a reasonable time" is equivalent to a ruling of law that upon the undisputed facts, as applied to each of the representations, the rescission was made within a reasonable time.

12. What is a reasonable time within which the right of rescission of a contract must be exercised must be considered with reference to all the circumstances of the case. A lapse of time which would be unreasonable in one case may be entirely reasonable in another. Under the evidence in this case, it is held that a ruling as a matter of law that the right of rescission was seasonably exercised was not erroneous.

13. Assumpsit for money had and received is a proper form of action to recover back money paid through fraud or false pretenses, and is appropriate to the claim of the plaintiff in this case.

14. When objection is made to testimony offered, and the presiding Justice says "You may omit it for the present; I will consider it," and the evidence is not afterwards offered, and no further ruling is made, exceptions do not lie as for the exclusion of the testimony.

15. There is sufficient evidence in the case to support the verdict of the jury.

16. The word "almost" implies uncertainty, want of precision, and one using it within certain limits does not commit himself to exactness or positiveness. but the word also implies that the limits are narrow, and, when such limits are transcended, the expression may, and sometimes must, cease to be regarded as an opinion and become a representation of a fact.

17. In mining parlance an interference exists where within the boundaries of the lands sold, or partially within those boundaries, there are other lands owned by other parties; and it is a prejudicial interference, when the intervening lands are so situated as to interfere with the operation and use of the lands sold, and thereby affect their value.

18. "Metallurgical coke" is coke suitable for the smelting of iron.

On motion and exceptions by defendant. Overruled.

Action of assumpsit for money had and received to recover the sum of $100,000 paid by the plaintiff to the defendant for an option to purchase certain coal and iron properties in the State of Tennessee, with interest on said sum from March 13, 1906, the date of said payment. Plea, the general issue.

Tried to a jury at the October term, 1908, Supreme Judicial Court, Kennebec County. Verdict for plaintiff for $116,133.33. The defendant filed a general motion for a new trial and also excepted to several rulings made during the trial.

The case is stated in the opinion.

*Page, Crawford & Tuska, A. M. Goddard,* and *H. D. Howe,* for plaintiff.

*T. M. Steger, Heath & Andrews,* and *Charles C. Treube,* for defendant.

SITTING: EMERY, C. J., SAVAGE, PEABODY, SPEAR, CORNISH, KING, BIRD, JJ.

SAVAGE, J. This is an action for money had and received, in which the plaintiff seeks to recover $100,000 which he paid to the defendant, a Maine corporation, for an option to purchase certain iron and coal lands which the defendant owned, and certain other iron and coal lands which the defendant agreed to acquire and convey to the plaintiff. The plaintiff did not exercise the option. And he claims now to recover back the money paid on the ground that he was induced to take the option and pay the money therefor by the fraudulent misrepresentations of the defendant, or its authorized officers and agents. The plea was the general issue. The verdict was for the plaintiff. And the case comes before us on the defendant's exceptions, and a motion for a new trial.

In the year 1905 the attention of the plaintiff, who lived in Chicago, was attracted to the iron and coal properties of the defendant, which were situated in Tennessee, by one Fall, who at that time or later had some sort of an option upon them, or upon a majority of the stock in the defendant corporation. The plaintiff was president of a railroad company, whose road run into Chicago.

He wished to increase the business of his company, and to that end, in part at least, he wished to purchase coal lands, the coal of which would produce coke suitable for smelting iron ore, and he hoped to supply that coke to the Chicago market. During the year 1905 certain somewhat general examinations were made by the plaintiff and his agent and representative, Potter, of the properties which were afterwards included in the option. The defendant was then operating its mines on these properties, and had been doing so more or less from some time in the year 1903. Its iron mines were widely separated, but its coal mines, the "Bon Air," the "Ravens-croft," and the "Eastland" were situated within a radius of from ten to twenty miles from one another. The latter was on the Sewanee vein, so called; the others were not.

On March 13, 1906, the parties entered into what is called in the case an "option contract." By this contract the defendant agreed to sell to the plaintiff its coal lands, some 44,000 acres, on which three mines were then being operated, and its iron ore lands, amounting to a little over 80,000 acres, on which were two blast furnaces where it manufactured iron from its own ore. By the contract, the defendant also agreed to acquire, on or before May 1, 1906, certain other lands, that it might be able to transfer them to the plaintiff under the option. These other lands were coal lands, adjacent to the defendant's coal lands and are called in the case the "North American lands" and the "Steger lands." The Sewanee vein, above referred to, run through these lands. The "North American" lands, about 35,000 acres, were then owned by the North American Coal & Coke Company, one-tenth of whose stock was owned by the general manager of the defendant company, and the other nine-tenths by persons not connected with these pro-ceedings. The "Steger lands, about 25,000 acres, were owned by a syndicate made up almost wholly of men who were either directors or stockholders of the defendant company.

By the contract the defendant agreed to execute a mortgage for $1,500,000, which would be a first mortgage on the North Ameri-can and Steger lands, and a second mortgage on the defendant's own lands which were already mortgaged for $765,000. Of the

bonds secured by the new mortgage, $1,000,000 could be used in the acquisition of the North American and Steger lands, while the remaining $500,000 could be sold only at par, and the proceeds could be used only for the improvement and development of the North American and Steger lands.

The defendant accordingly issued its bonds for $1,500,000 secured by mortgage as agreed. It acquired the North American and Steger lands in accordance with the contract, paying its own bonds for them. And it performed every other contract condition precedent.

The option was to run until March 1, 1907. The full contract price was to be $5,000,000 for the property the defendant then owned and that which it agreed to acquire, subject to the mortgages. For the option to purchase this property during the life of the option the plaintiff paid $100,000, which was to be credited as a part of the purchase price if he elected to purchase.

Coincident with the option contract, the plaintiff subscribed for $250,000 of the improvement bonds above referred to, and agreed to take them on or before August 1, 1906, but this subscription was rescinded in the following September.

On February 16, 1907, the plaintiff in writing rescinded the option contract, alleging fraudulent misrepresentations on the part of the defendant, and on March 7, 1907, six days after the option would have expired by limitation, he brought this suit, alleging in his specifications certain fraudulent misrepresentations, which it is claimed were a part of the inducement to take the option and pay the $100,000.

During the year 1906, the plaintiff caused the books of account and other books and papers of the defendant to be examined by expert accountants, with a view to ascertain the cost of mining coal and its selling price, the cost of mining iron ore and manufacturing it, and its selling price, the monthly profits, past and present, and the past and present annual profits of the defendant company. The plaintiff also caused an examination and tests to be made on the North American and Steger tracts to ascertain the probable quantity and the quality of the coal deposited there.

While the plaintiff in his specifications claimed other fraudulent misrepresentations, three only were submitted to the jury, and it is only necessary to consider those.

First, the plaintiff claims that it was represented to him that the Bon Air, North American and Steger lands were an almost unbroken tract, and in effect, that there were no interferences, or at least no prejudicial " interferences," and that the North American and Steger lands were in fact an unbroken tract. In mining parlance, an interference exists where within the boundaries of the lands sold, or partially within those boundaries, there are other lands owned by other parties. And it is a prejudicial interference, when the intervening lands are so situated as to interfere with the operation and use of the lands sold, and thereby affect their value.

It should be observed that in the option contract the lands were described as consisting of many parcels, each separately described in terms or by reference to the registry of recorded deeds, and not as one solid tract embracing all within specified external boundaries.

The plaintiff contends that the representations as to the North American and Steger lands were untrue, and that they were material as affecting the value of the lands to be sold.

Secondly, the plaintiff claims that the defendant fraudulently misrepresented the coking qualities of the coal on the North American and Steger tracts, with respect to the quantity of sulphur contained in it. It is conceded that when the sulphur content exceeds one per cent, it cannot be used in the manufacture of iron or steel.

Thirdly, the plaintiff claims that the defendant made fraudulent misrepresentations to him as to the cost of mining coal and its selling price, the cost of mining iron ore and manufacturing it, and its selling price, and the monthly and annual profits of the defendant, both past and present, and he claims that such mispresentations were material and are actionable.

Upon these propositions of fact, the defense generally and broadly stated is, that the defendant did not make the representations alleged ; that such representations as were made were true ; that if the defendant made the representations alleged, they were

merely expressions of opinion, and were so understood by the plaintiff, that the representations which were made were not relied upon by the plaintiff, and as to some of the representations, that they were not material.   But it is admitted that such representations as are alleged to have been made respecting the coking qualities of the coal on the North American and Steger tracts were material, and if untrue, actionable.

Some of the representations now relied upon by the plaintiff it is claimed were made by Mr. Williams, the president of the defendant corporation, and some by Mr. Overton, its general manager. It is conceded that the representations of either of these gentlemen bound the corporation.   And for convenience we shall refer to the representations of either of them as the representations of the defendant.   It is claimed that some of these representations were made to the plaintiff personally and some to Mr. Potter, his representative and agent, who afterwards communicated them to the plaintiff. And it is claimed that representations relating to the same subject matter, but differing somewhat in terms, were made at different times during the negotiations by Williams or Overton to the plaintiff or Potter or both.   The defendant contends that it is not bound to answer for the representations made to Potter, but we think otherwise. It is clear that Mr. Potter was known by the defendant to be the representative of the plaintiff.   The defendant knew that Mr. Potter was sent by the plaintiff to the mining regions to examine the properties in question, to gather information and report to the plaintiff, and that in all matters of investigation he continued to represent the plaintiff.   He says that he reported the representations made to him to the plaintiff.   It cannot be questioned that representations made to an agent with the understanding that they are to be reported by him to the principal, stand in the same category with those made directly to the principal.

There is no contention here as to the general principles of law respecting actionable false representations.   And if the plaintiff would recover back money with which he claims he was induced to part by the representations of the defendant, it is incumbent upon him to show that the representations were intentionally made, with

the intent that he should act upon them, or in such a manner as would naturally induce him to act upon them ; that they were false, and were known by the defendant to be false, or being of matters susceptible of knowledge, were made as of a fact of its own knowledge ; that they were expressions of past or existing facts, and not expressions of opinion ; that they were material ; and that he relied upon them, was deceived, and was thereby induced to part with his money. *Eastern Trust & Banking Co.* v. *Cunningham*, 103 Maine, 455 ; *Goodwin* v. *Fall*, 102 Maine, 353 ; *Atlas Shoe Co.* v. *Bechard*, 102 Maine, 197.   Such representations are fraudulent. And if the plaintiff has proved all the essentials which go to make actionable the false representations he alleges, or any one of the representations, he is entitled to recover back the $100,000 which he was thereby induced to pay for the option, and to hold his verdict for the same, unless he is in other respects barred, as the defendant claims.

The representations in regard to the continuity of the land and the coking qualities of the coal are so interwoven in the plaintiff's testimony that it will be convenient to state them together.   As to these the plaintiff testified as follows : —

"Q.   I will take up first the matter of the lands themselves.   Now in regard to the coal lands.   What if anything was said to you in regard to the area, extent and continuity of the coal lands by Mr. Overton on that trip in November, 1905?

A.   Mr. Overton stated to me that the Bon Air Company itself owned in the vicinity of 44,000 acres, somewheres from 40,000 to 45,000 acres—I think 'he specifically stated about 44,000 as near as he could figure—of coal lands in the Cumberland Plateau, a practically unbroken field ; that there were some interferences, that is, by ownerships that they did not possess, owners other than the corporation, but they were all of little or no consequence except such as they had options upon or were able to acquire without any trouble at any time they wanted to;   that their associates and themselves owned an adjoining tract of land comprising from 50,000 to 60,000 acres of additional coal lands and that those coal lands had two veins upon all of them, and upon many, three, of first-class fuel

coal and first-class coking coal from which coal could be made that would compete with the Pennsylvania and Virginia coals in the Chicago market, that it was as to analysis fitted to that market; that the fuel coal was first-class in every particular, good for any market. The coke ovens that they had constructed were, as he stated to me, kind of experimental plants. Of course two hundred coke ovens are not of much importance in the commercial world of coke. And the other coal that they were mining at Eastland was of a character that would make a coal fitted for the Chicago market.

Q.   The Chicago market for what purpose?

A.   For the manufacture of steel and iron.

Q..  And in speaking of the analysis of the coal did he make any comparison with any other known coal?

A.   He said it would compare favorably with the so called Connellsville coal, Pennsylvania, which is one of the oldest operations in the country.

Q.   Just state the conversation.

A.   It would compare favorably with the Connellsville coal.

Q.   You spoke of some other coal properties which Mr. Overton spoke of having control of, either he or the company.

A.   Those properties were known as the T. M. Steger and North American Coal & Coke Company's properties, which they have since acquired, comprising 60,000 about, and they were supposed to carry, and he represented them as carrying, the Sewanee vein of coal generally, and that coal upon that property in particular was low in sulphur, which is a very important factor and would make the best coking coal for the Chicago market, which I was looking for coal for; that this land was an almost unbroken tract. He showed me a map of it or a government map upon which they had marked the Steger and North American Coal and Coke Company's property and the properties of the Bon Air Coal and Iron Company. That map I believe we have now.

Q.   You spoke of representations of its being almost an unbroken tract. To what properties did that representation apply as Mr. Overton stated?

A.   It applied to all the properties that the Bon Air, with the Steger and North American, possessed, and the extent of any ownerships within their property was not of sufficient importance to interfere with its general operation, that they amounted to very little, and that all that did amount to anything they would be able to acquire and were in a position to acquire at any time they wanted to ; so it might be regarded as an unbroken field of coal comprising from 100,000 to 104,000 acres.

Q.   In speaking of the matter of interferences in these properties did he draw any distinction as to the relative number of interferences in the Bon Air property that was owned by the company and the T. M. Steger Trustee and North American Company's property, with respect to the relative number of interferences?

A.   The North American and Steger properties, it was not represented that there were any.   That I understood from what they stated to me, that that was entirely unbroken ; and that the Bon Air interferences, while there were several, they amounted to practically nothing.   There was one piece of property they spoke of, one they had some trouble about, at Clifty Creek, where there was a small mine, near their Eastland property, that they always thought they could acquire when they wanted to."

The plaintiff also claims that the defendant gave him a map which represented the North American and Steger properties as unbroken by interferences.

And in regard to the coking qualities of coal in the North American and Steger tracts, Potter testifies that Overton told him that "in their examinations of the coal underlying all that country, in that district, from numerous outcrops and several drillings it showed almost invariably low sulphur, sulphur sufficiently low for the manufacture of metallurgical coke," by which term is meant a coke suitable for the smelting of iron.   And as is admitted such a coal must not contain over one per cent of sulphur.

I.   *Continuity.*   This question relates to the North American and Steger tracts only.   The defendant contends that the alleged representations were not made, nor relied upon if made, but that the plaintiff was fully advised that there were interferences before

he took the option, and substantially what they were, though not perhaps their precise location on the face of the earth,—and that he relied upon his own knowledge of the situation. The determination of these issues depends upon the degree of credit which should properly be given to the testimony of the respective witnesses. And upon this question of credibility, which arises many times in this case, we shall comment briefly later.

But the defendant goes further and contends that the representations testified to were merely expressions of opinion, and so received. And in argument under its first exception it complains that it was error for the court to submit to the jury the question whether the representations were expressions of fact or of opinion. But we think no error is shown. We think, also, that the jury were warranted in finding that the representations, or some of them at least, were expressions of fact, and were so understood. The question may be viewed in two aspects. First, the plaintiff testifies explicitly that the defendant represented that the North American and Steger tracts were unbroken in ownership—in effect, that there were no interferences, prejudicial or otherwise, on those tracts. This is clearly an expression of a fact, and not of an opinion. Secondly, the plaintiff testifies that Overton represented that "this land was an almost unbroken tract," and being asked to what properties that representation applied, answered:—"It applied to all the properties that the Bon Air, with the Steger and North American, possessed, and the extent of any ownership within their property was not of sufficient importance to interfere with its general operation, that they amounted to very little, and that all that did amount to anything they would be able to acquire, and were in a position to acquire at any time they wanted to, so it might be regarded as an unbroken field of coal comprising from 100,000 to 104,000 acres." This and the former statement may not be wholly consistent. And yet, it may not be improbable that the plaintiff, even if he did understand that there were no interferences on the North American and Steger tracts, might understand the defendant in speaking of the whole, Bon Air, North American and Steger, as "an almost unbroken tract," as meaning

broken only by the interferences on the old Bon Air property. For doubtless, in their conferences the parties were in some respects considering all the properties as a whole. In any event, it was for the jury to say what he meant.

But if the representation was, not of unbroken ownership, but of non-prejudicial interferences in part on the North American and Steger lands, even then the representation was not necessarily wholly an expression of opinion, though some parts of it, doubtless, were. Whether saying of a certain tract of land that it is "almost unbroken" by the ownerships of others is an expression of opinion or not may depend upon circumstances. Whether it is an opinion may depend upon the number, the extent, and the situation of the lands owned by others. Within certain limits it might be regarded almost necessarily as an opinion. The word "almost" implies uncertainty,—want of precision. One using it within certain limits does not commit himself to exactness or positiveness. But the word "almost" also implies that the limits are narrow. When those limits are transcended, the expression may, and sometimes must, cease to be regarded as an opinion, and become the representation of a fact. If, for instance, the interferences on the North American and Steger lands amounted, as it is claimed, to one-fifth or more of the entire area, can it be any longer said that the expression "almost unbroken tract" must necessarily be regarded as an opinion? We think not. Even the qualifying statement that the interferences were not of sufficient importance to interfere with the general operation of the property might not properly be regarded, under all the circumstances, as a mere expression of opinion. It depends upon the circumstances. But we think we need not consider the topic further. The presiding Justice did not discriminate between the different phases of the same expression, and was not asked to. He had already properly instructed the jury that it must appear that the representations were made as of the defendant's "own knowledge, and not merely as an expression of opinion," if they were to serve as a basis of recovery; in substance, that no person is authorized in law to depend upon a mere expression of opinion as an inducement to purchase; that "in many cases, the

representation is capable of being understood either as an expression of opinion, or as a statement of a positive fact, and the meaning of it must be considered and examined and determined with reference to the subject matter, with reference to the knowledge which the parties had of the matter at the time, with reference, of course, to the precise language in the first place and as interpreted by the subject matter and all of the circumstances surrounding the parties at the time."

These general instructions certainly reached all the phases of this branch of the case. The jury were instructed that opinions expressed were to be disregarded, and how to determine, in case of doubt, what should be regarded as an expression of opinion, and what not. If the defendant wished for more specific and discriminating instructions, we think it should have asked for them. We discover no error in the ruling complained of.

It will be convenient in this connection to notice the remaining contention of the defendant under its first exception. The presiding Justice, having stated the contention of the plaintiff, to support which evidence had been introduced, that interferences would or might materially affect the expense of operating the mines, and the claim that the interferences did materially affect the value of the property, said to the jury;—"I say for the purposes of this case that it (the representation that 'the whole tract was practically solid') would be material if it affected as claimed the cost of mining as suggested." The defendant challenges the correctness of this rule, on the ground as stated in its brief, that "while the question of materiality is one of law for the court, where the evidence raises the question of fact as to whether or not the plaintiff treated the matter as in any degree material, the question of materiality should be submitted to the jury." Of course, if such was the case, it would be a question of mixed law and fact, and the court should submit the question of fact to the jury, with instructions as to what would or would not be material as matter of law. The jury applying the law of materiality as given by the court to the facts found by them would determine the issue of materiality in that particular case. But they do not determine the law of materiality.

In discussing this exception, the defendant does not point out any evidence that the plaintiff did not treat the matter as material, nor have we found any.    There is, indeed, testimony that the plaintiff was informed of the interferences, that he knew all about them, from which it is properly argued that he did not rely upon the representations, and was not deceived and in that sense did not treat the representations as material.    But if the jury found this contention to be true in fact, it must be conclusively assumed, under other instructions given them, that they did not return a verdict against the defendant on the continuity issue, and in that case the question of materiality raised by the exception is itself immaterial.

The ruling complained of and our conclusion are necessarily based upon the assumption that the representations were made and relied upon as claimed by the plaintiff.    The ruling assumed to touch only the question of materiality as a matter of law.    The presiding Justice instructed the jury that it must appear that the plaintiff relied upon the representation, and that he had been induced to take the option.    That question the jury passed upon.    If the representation was made and was relied upon, then it seems clear to us that the question of the continuity of ownership in an area for the most part untested and untried did materially affect the question of value.    The fact that there were interferences would affect value, even if the precise effect of the interferences were unknown.    This exception must be overruled.

II.    *Coking qualities of coal.*    This contention relates solely to the coal on the North American and Steger tracts, and is concerned only with the amount of sulphur in the coal.    The coal on the old Bon Air tract was not a metallurgical coking coal, and that fact the plaintiff well understood.    One of the representations was to the effect that the coal underlying these tracts "showed almost invariably low sulphur, sulphur sufficiently low for the manufacture of metallurgical coke;" and another that coke made from it "would compete with the Pennsylvania and Virginia cokes in the Chicago market, that it was as to analysis fitted for that market," that "it would compare favorably with the so called Connellsville, Pennsylvania, coal."    There is no question but that the Connellsville coal

is regarded as a standard coking coal, with considerably less than one per cent of sulphur. The evidence shows, and it is also admitted, that if the representations were made, they were made with reference to the fitness of the coal to produce a coke that would be suitable for smelting iron. The plaintiff wanted a coal which would produce a coke suitable for the iron manufacturing market of Chicago. The defendant knew this. It was this quality of the coal which both parties had in mind when the representations were made. And as already stated, to produce such a coke, the coal must not contain in excess of one per cent sulphur.

It is admitted that the representations were material, but the defendant contends that they were merely expressions of opinion, and, further, that the plaintiff did not rely upon them ; that during the year prior to the making of the option he had become acquainted with all the facts which were known to the defendant, and that he relied not upon the representations, but upon his own knowledge of the situation. The plaintiff unquestionably knew that tests had previously been made of coal from the same veins, but several miles distant, showing very low sulphur. Tests were made by his direction in 1905 of Eastland coal on the same veins, six miles distant, on the Bon Air property, which showed very high sulphur, prohibitively high. It also appears that several tests of coal taken by Overton, as he says, from the North American and Steger were made known to the plaintiff in 1905. These tests showed very low sulphur, and were satisfactory in that respect. On the other hand, the plaintiff claims that taking all the circumstances into account, and particularly the high sulphur which was uniformly shown by tests made by him in 1906, it is a fair and legitimate inference that the coals which showed satisfactory tests in 1905 were not taken from the North American and Steger tracts, or, at least, not from workable veins on those tracts. We state these contentions, not to discuss them at this point, but merely to show their nature, and that the issues depended to a considerable degree upon the credibility of witnesses.

The contention that the representations were merely expressions of opinion may be disposed of briefly. When it is remembered

that the parties had in mind a coal which would produce coke suitable for smelting iron and to be sold in the Chicago market, and that such a coal must contain less than one per cent of sulphur, it is clear that a representation that a coal would compete with the Pennsylvania and Virginia coals in the Chicago market, and a representation that it would compare favorably with the Connellsville, Pennsylvania, coal, meant that that coal contained less than one per cent of sulphur, and whether it did or not is a question of fact. Whether, however, the representation was intended to express an opinion concerning that fact, and was so understood by the plaintiff, was a question for the jury, and was properly submitted to them.

The defendant's second exception relates to this topic. It excepts to all that the presiding Justice said to the jury on the coking question, which ended with the following ruling: "I say to you if you find that the representation was made as of a matter of fact of the defendant's personal knowledge, it would be material as affecting directly in an important way the value of the property." We discover no error in this part of the charge. The defendant specifically objects to the ruling as to materiality above quoted, upon the same grounds as urged in its objections upon the same question under its first exception. And we overrule this exception for the same reasons that we overruled the first exception.

III.   *Cost, Prices and Profits.*   We can only briefly epitomize the contentions of the parties upon this branch of the case. The evidence discloses many representations concerning many items, that is to say, representations as to cost and selling prices by items in detail, as well as to net profits by the ton of the different products, and net profits of the whole operation. It is impracticable to state an analysis of the testimony. We will refer to some of the items, but it will not be necessary to refer to all. As briefly as we can we state the contentions of the parties.

The plaintiff's claims are represented in the following tabular statement:

| *Subject matter by the ton.* | *Representations to plaintiff* | *to Potter* | *Actual fact shown by defendant's books and accountants' reports.* |
|---|---|---|---|
| Cost to mine Bon Air coal. | 85 c to 90 c | 90 c to $1. | $1.23 to $1.26 <br> 6 months '06 $1.35 |
| " " Eastland coal | 60 c to 65 c | 75 c to 85 c | $.764 6 mos. $.743 |
| " - " Ravens- croft coal | (and all from) (60 to 85 c ) | | $1.02 6 " $.926 |
| Cost to mine iron ore 60 c. | | 60 c. | $.779-.825. <br> 6 mos. $.834-$1.104 |
| " to manuf. pig iron | $11 to $12. | $10.50 to $11.50 | $11.94 av. 6 mos. '06 $12.84 <br> At Allen's Creek. |
| Selling price Bon Air coal | Not less than $1.45 | Av. $1.45 | $1.35 to $1.44 <br> $1.38 '05 <br> 6 mos. '06 $1.392 |
| " " Eastland | $1. and more | $1.15 | $.91 3 mos. '05 <br> 6 mos. '06 $.84 |
| " " Ravenscroft | | $1.18 to $1.28 | 6 mos. '06 $1.118 |
| " " Pig iron | av. $14.133 | | $13.19 av. 3 yrs. <br> 6 mos. $14.157 <br> At Allen's Creek |
| Profits coal general-ly | 25 c to 45 c not less than 35 c | 25 c. | ($.121 to $.179 Bon Air <br> ( av. 3 years $.149 <br> ( 6 mos. '06 $.035 <br> ($.148 Eastland 3 mos. '05 <br> ( 6 mos. '06 $.098 <br> ($.155 Ravenscroft 6 mos. <br> ( '06, $.192 |

| | | | |
|---|---|---|---|
| Profits pig iron | $2 to $4 | $3. | ($2.956  1903 |
| | | | ( 1.062  1904 |
| | | | ( 1.817  1905 |
| | | | ( 1.903  1906 6 months. |
| Net profits monthly | | $16,000 to | |
| | | $25,000 | $6,000 to $12,000 |
| "      "      annually | | $200,000 to | |
| | | $250,000 | $163,510.76 1903 |
| | | | 108,445.76 1904 |
| | | | 143,471.57 1905 |
| | | | 73,916.42 6 mos. 1906 |

The foregoing figures are taken from the evidence. The data for full tabulation are not complete in all respects. Taking the book figures on cost and profits as they stand, the parties disagree as to what was actual cost and actual profits. The defendant claims that some elements not appearing upon the books, and which it is not now necessary to specify, affect the question of actual cost and profits, reducing the one and enlarging the other. And in argument the plaintiff says some concessions may be made. The defendant denies that the representations were made as alleged, and claims that all representations which were made were mere estimates and were so understood by the plaintiff, and that the plaintiff was expressly told that these figures showing the results of these years of experimental work at the beginning of the defendant's operations must not be taken as a basis on which to consider values.

But after making all concessions that can reasonably be claimed, it is evident the jury were warranted in finding that some of the representations on this branch of the case, if made as alleged, and made as statements of fact, were untrue ; and, if made as estimates, were incorrect. Whether they were warranted in finding that they were made at all depends upon the credibility of the witnesses. And here the defendant vigorously attacks the credibility of the plaintiff on the particular ground that in a deposition given by him before the trial, he stated the representations differently from those testified to at the trial, for example, the cost of mining coal, 70 to 80 cents

a ton; that the profit on coal was from 25 to 60 cents a ton; that the cost of mining iron ore was from 50 to 55 cents a ton; that cost of manufacturing pig iron was from $10 to $10.50 a ton; that the profits on pig iron were from $4 to $6 a ton; that the monthly profits ranged from $12,000 to $25,000. To this the plaintiff replies that differing statements were made at different times. The questions whether the representations were made, and if made, whether as statements of fact or mere estimates, and whether they were relied upon by the plaintiff were properly submitted to the jury.

The presiding Justice ruled that if made, as claimed, they were material, on the undisputed facts in the case. In its third exception the defendant seeks to test the correctness of this ruling. It is well settled in this State and elsewhere that representations as to the cost and selling price of articles manufactured by the seller and proposed to be sold to the buyer, and the profits of the manufacture are material and actionable, and if false and fraudulent and relied upon, money, the payment of which was induced by them, may be recovered back. *Coolidge* v. *Goddard,* 77 Maine, 578; *Hoxie* v. *Small,* 86 Maine, 23; *Braley* v. *Powers,* 92 Maine, 203. This principle must apply as well to representations as to the profits of a business proposed to be sold, and in the sale of mining lands, as to the profits of mining as it is carried on by the owner. This principle is not controverted.

But the defendant states his objection to the ruling in these words:—"If the undisputed facts show that the parties did not treat the matter as material, this ruling, we submit, is erroneous." So it would be. If the parties did not treat the representations as material, they were not material in fact in this case, though they were of a character which the law deems material. But the presiding Justice was not attempting to settle any disputed questions of fact. He was stating a principle of law. The disputed questions, whether the representations were made, whether they were made as of facts, whether the plaintiff relied upon them, and whether they were true, had been submitted to the jury, as already stated. But beyond the range of dispute there were other facts not

in dispute, namely, that the defendant was an owner seeking to sell, that the plaintiff was a prospective purchaser seeking information ; that the representations, if made as such, were given for the purpose of information, and that whether they were true or not affected the value of the property in question.  Upon these undisputed facts the representations were material as a matter of law. This exception must be overruled.

Thus far we have contented ourselves, for the most part, in stating the contentions of the parties and have refrained from comment upon the effect of the evidence.  In addition to what has been said already, in regard to the several alleged representations, it should now be said that the defendant contends with great force not only that all representations which were made were substantially true, but that the plaintiff's conduct shows that he so understood it, at least with regard to continuity and profits, and that he was finally dissuaded from exercising the option, not because he had been deceived, but perhaps because of unforeseen difficulties in financing the enterprise, which called for the immediate outlay for the purchase and the contemplated development of almost $10,000,000.  It is contended that he knew of the want of continuity of the North American and Steger tracts as early as July, 1906, when he approved the mortgage in which over two hundred parcels owned by others were specifically excepted, though it is not claimed that he knew the precise location of those parcels until later, perhaps in October.  It is claimed that he knew by the accountants' reports in July and August, 1906, that the cost, prices and profits had not been as he now claims they had been represented. And it is argued that if he knew these things, his subsequent conduct was inconsistent with his present claims as to misrepresentations.  It is said that he made no protest that the representations had been untrue.  He proceeded with his investigations and tests ; as late as October 1, 1906, he wrote to Overton that on the assumption that later tests should show coal sufficiently low in sulphur to satisfy the Chicago market, "there is little doubt but what the purchase of the property may go through, and the whole arrangement terminated in a satisfactory manner," and not until

his letter of rescission February 16, 1907, did he claim specifically that there had been any misrepresentations as to continuity or profits. All of this, if true, has, of course, a tendency to show either that the representations were not made, or that the plaintiff had not relied upon them, but upon his own knowledge of the situation after examination.

And even as to the coking qualities of the coal, it is contended that he held onto his option and made no complaint to the defendant from about October 24, 1906, when he received the final tests, until February 16, 1907. In short, it is contended that the misrepresentations alleged by the plaintiff are an after-thought. And it must be conceded that there is much force in the argument so far as continuity and profits are concerned, much less force so far as coking qualities of the coal are concerned. And we do not forget that if it were shown that the plaintiff assumed ·false positions with respect to some of the issues, it must seriously affect his credibility as to the others.

We now state our conclusions upon the motion. The testimony is voluminous. An analysis of it in detail would far transcend the reasonable limits of an opinion. Nor would it serve any use except the satisfaction of the parties. We have had to content ourselves with the barest summary of the contentions of the parties, with such extracts from the testimony as would best illustrate them. We think we have at least made apparent the multiplicity of the contentions. We have not thought it necessary even to notice all of the minor contentions. But we have made a most painstaking study of the 1800 pages of printed matter contained in the record, and of the more than 400 pages of the briefs of counsel, and we have bestowed upon the case a care commensurate with its importance.

The correct decision of the fundamental issues of fact in this case must depend chiefly, if not wholly, upon the varying degrees of credibility which may properly be attached to the testimony of the plaintiff and Potter on the one side, and of Williams and Overton on the other, considered in the light not only of what they say, but of their conduct and of the general situation. The jury, by law,

are made the judges of the credibility of witnesses. They not only hear them, they see them. We can only read their testimony. The burden is on the defendant to pursuade us that the verdict is clearly wrong. We are not persuaded to that extent. We think it would be going too far to say that the jury were not warranted in accepting the testimony offered by the plaintiff, and in finding that some, at least, of the alleged representations were made, as of matters of fact, as of the knowledge of those making them, that they were made with intent that they should be acted upon, that they were untrue, that the plaintiff relied upon them and was deceived, and was thereby induced to pay the $100,000 for the option. Moreover, the weight of the evidence, as to some of the propositions, seems to us clearly to preponderate in favor of the plaintiff. The motion for a new trial must be overruled.

But this does not end the case. The defendant has other exceptions which must be considered. Exceptions 4 and 11 may be considered together. We have already said that the plaintiff's attention was called to the defendant's properties in 1905, by one Fall, a son of one of the directors. The record shows that at various times, but not all the time from March 28, 1905, until February 21, 1906, and while the negotiations with the plaintiff were proceeding, Fall had various written options from the defendant, or the majority of its stockholders, either on the stock of the defendant, or on its property, or both; also from the owners of the North American and Steger tracts. In some of the options it was provided that on sale of the property Fall should receive a commission of $500,000. This fact was not made known to the plaintiff. Fall claims to have stood as a broker for his employers while he held the options, and he was very much in evidence with the plaintiff, from whom it appears that he expected, at least, after the option contract was signed, to receive a commission or a division, in case the arrangements were successful. In the course of his charge the presiding Justice remarked as follows: "On the other hand the plaintiff says there are many things here which are in harmony with his contention as to the conduct of the parties at the time, that they were anxious to dispose of this property, that they had arranged with young Fall to give him

$500,000 for negotiating the sale. While they refused to give the plaintiff an option for less than $100,000 in cash, they charged Mr. Fall nothing but agreed to give him $500,000, and they showed great anxiety to dispose of the property." To these remarks exception 4 was taken. The court made no ruling of law. But counsel says that "the instruction given put the court in the position of ruling that under the various Fall options he was to receive $500,000 from the sale finally made to Hotchkiss." We do not think so. The presiding Justice was referring to what Fall was to receive under his own options, and in view of the whole record, we think he must have been so understood by the jury. But even if it were otherwise, the defendant was not prejudiced. The matter was a collateral one anyway. Its only use was to show the extent of the anxiety of the defendant to sell. It could make no difference to the defendant whether that was shown by the commission provided for in Fall's options, or by the same commission out of the plaintiff's purchase money.

But at the end of the general charge the defendant requested the following instruction, touching the same matter, "Eighth : That legally and properly construed the right of Fall, Jr., to receive any commission whatever from the defendant corporation or its stockholders ceased after February 21, 1906, and from February 21, 1906, and thereafterwards Fall had no claim for commission from the defendant corporation or its stockholders. Upon the undisputed evidence Fall's right to demand commissions ceased on February 21, 1906." To the refusal to give this ruling the defendant took his exception 11. This exception is not sustainable. First, it called for a ruling upon a question of fact. Secondly, for the reasons just given under exception 4 the defendant was not prejudiced. Moreover, although so far as the case shows Fall's last written option expired February 21, 1906, the presiding Justice could not well say that Fall's right to demand commissions ceased on February 21, 1906, "on the undisputed evidence," when there was evidence that on February 22, 1906, Overton told the plaintiff that Fall "was fussing around about some commission and they would have to pay

him a little something," and repeated the same statement substantially on March 12.

Exception 5 is to the following instruction : "If you find that any of these misrepresentations alleged to have been made was made under all the rules and qualifications I have given you as to what the representation must be—as of his own knowledge and the plaintiff relying upon it and that it was material—that would justify the plaintiff in rescinding the contract and he would be entitled to recover back the one hundred thousand dollars and interest from March 13, 1906 ; otherwise, your verdict will be that the defendant did not promise." We discover no error in the ruling. We shall discuss later the matter of rescission.

Exceptions 6, 9 and 10 are not pressed.

Exception 7 is to the refusal to give the following requested instruction : "That under the undisputed facts the defendant corporation is not, as a matter of law, liable for any of the representations claimed by the plaintiff relating to the properties of the T. M. Steger Trustee, and of the North American Coal and Coke Company, said properties at and before the execution of the option contract of March 13th, 1906, not then being owned by the defendant and the defendant not then being in possession thereof." The cases cited by the defendant under this exception, *Medina* v. *Stoughton*, 1 Salk. 210; *Morley* v. *Attenborough*, 3 Welsb. H. & G. Exchq. 499 ; *Pratt* v. *Philbrook*, 33 Maine, 23, are not in point. We do not know of any that is. But we can conceive of no legal or logical distinction between representations by the owner of the qualities of a thing which he proposes and agrees to sell at the option of a prospective purchaser, and similar representations made by him concerning another thing which he agrees first to buy, and then to sell to the same purchaser, at his option. We think there is no distinction. If the defendant made false representations about the coal on the North American and Steger lands with a view to induce the plaintiff to buy them in connection with its own lands, or to pay for an option of purchase, and as a part of the arrangement the defendant was to purchase these lands, and to convey them to the plaintiff at his option, and if the plaintiff relying upon the represen-

tations was so induced to take and pay for the option, there is no reason why the defendant should not be subjected to the same liabilities as it would have been if it had made the same representations about the coal on its own lands.

Exceptions 8 and 12 will be considered together. Exception 8 is to the refusal to give the following requested instruction : "That under the undisputed facts the plaintiff did not rescind the option contract of March 13th, 1906, within a reasonable time and for this reason this action is not now maintainable," and exception 12 is to the following instruction which was given : "I am requested to instruct you that it was the duty of the plaintiff to rescind within a reasonable time. I give you that instruction, but I say for the purposes of this trial, if you find any one of these alleged incorrect misrepresentations to have been made with all the qualifications I have put in, you will be authorized to find that the rescission was made within a reasonable time."

Under these exceptions the defendant contends that as a pre-requisite to the right to maintain this action in assumpsit it was the duty of the plaintiff, upon discovery of the fraud or falsity of the representations to rescind the option contract, and to do so within a reasonable time, and that upon the undisputed or admitted facts the plaintiff did not rescind within a reasonable time, as a matter of law, and hence that the action is not maintainable in any event. Or if the facts were in dispute, which in this case must relate to the times when the plaintiff became cognizant that the representations were not true, then it presented a question of mixed law and fact, and the presiding Justice should have submitted to the jury the question of reasonable time under proper instructions, instead of ruling as he did, that "if you find any one of these alleged incorrect misrepresentations to have been made with all the qualifications I have put in, you will be authorized to find that the rescission was made within a reasonable time."

It is contended that this instruction was virtually, though not expressly, a ruling as a matter of law that the rescission was made within a reasonable time, and that the action was maintainable, if the jury found for the plaintiff on all the other elements in the case.

This involved, it is said, a finding of fact, namely, when the fraud became known to the plaintiff, and as to this it is claimed that the fact was in dispute.

Briefly stated the position of the defendant is this.   A party to a contract may avoid it when it is induced by the fraud of the other party.   If he wishes to recover back in assumpsit the consideration paid, he must rescind the contract, and he must rescind it within a reasonable time after the fraud is discovered.   In order to make the rescission effectual he must restore the consideration, or whatever he has received under the contract, and place the other party in statu quo.   If he cannot place the other party in statu quo, or if the rights of innocent third parties have intervened, he cannot rescind, but is remitted to his remedy for the deceit, either by defending against a claim for the unpaid part of the consideration, if any, or by his independent action for deceit.   To recind within a reasonable time he must act promptly, as soon as he reasonably can under all the circumstances.   He must elect at once, and no longer hold the other party to his contract.   From expressions culled from the cases, "promptly on discovery," "must then decide," "immediately." "as soon as possible," "promptly on the first information," "at once," "as soon as may be," "as soon as he discovers falsity," "as soon as he learns the truth," "promptly, unconditionally and unevasively," "an instant duty to perform," "so much time as is necessary conveniently to do," counsel deduces the rule that with no facts to excuse delay, the party defrauded must rescind his contract at once, using no more time than is reasonably necessary to get into direct communication with the opposite party.

The foregoing rules are undoubtedly sound as general principles. In the application of them to this case, counsel contends that since the rule was given as to all classes of misrepresentations, indiscriminately, it permitted the jury to find not only that February 16, 1907, the date of the rescission, was within a reasonable time after October 24, 1906, when it may fairly be said that all the facts had come to the knowledge of the plaintiff, but that it was within a reasonable time from the preceding July, when it is claimed that

the plaintiff knew by examination and approval of the mortgage, that there was a want of continuity in the North American and Steger tracts, and knew by the accountants' reports that the alleged representations as to cost, prices and profits were not true. And whatever may be said of the question from the standpoint of October 24, the defendant says it was clearly erroneous in law to rule, or to permit the jury to find that the longer period from July, about seven months, was a reasonable time.

It is contended, moreover, that it was the duty of the plaintiff, knowing from the mortgage the want of continuity of the lands referred to, to rescind, if rescind he would, before the mortgage was executed and the bonds were issued, and before the owners of the North American and Steger tracts had conveyed them to the defendant, receiving their pay in the bonds secured by the mortgage. It owed this duty, it is claimed, to the defendant, to the defendant's stockholders, and to the owners of North American and Steger lands.   And the contention is that by neglecting to exercise the right of rescission at that time the plaintiff waived the right.   The parties had been put into new positions,— and positions prejudicial to them if the contract was not carried out.   They could not then be put in statu quo, and therefore the plaintiff had lost his right of rescission, on that ground.   Such are the contentions.   And the complaint in this respect is that if it were an undisputed fact that the plaintiff knew of the want of continuity before the execution of the mortgage, the ruling was wrong in that the jury were permitted to find that there was an effectual rescission at all ; and if the fact was in dispute, the issue should have been submitted to the jury under proper instructions, and not decided by the presiding Justice.

We think that taking the instruction complained of as a whole, it must be regarded as an instruction in law upon undisputed facts, and it can be sustained only if justified by the undisputed facts. What is a reasonable time within which the right of rescission must be exercised, when the facts are undisputed, is a question of law ; but when the facts are in dispute, the question of reasonable time must be submitted to the jury with appropriate instructions.

But what is a reasonable time must in any event be considered with reference to all the circumstances surrounding the case. It is not an absolute term. It is a relative term. A lapse of time which would be unreasonable in one case may be entirely reasonable in another. The importance of the transaction, the nature of the contract, the complexity of the issues involved, the necessity for opportunity to study the consequences and to exercise calm and deliberate judgment, must be considered. And moreover the conduct of the other party to the agreement attempted to be rescinded, as inducing delay, is a very important factor. As was said in *Pitcher* v. *Webber*, 103 Maine, 101, "a vendee is not bound to rescind upon the first discovery or supposed discovery of some one imperfection or misrepresentation. He is entitled to time for inquiries, experiments and tests. He can waive imperfections or misrepresentations first discovered, and yet be afterwards entitled to rescind upon the discovery of others, suggestions from the vendor to make further inquiries or trials would also extend the time for rescission."

Applying the foregoing principles to this case, after a most painstaking study of this question, we think it cannot be said that the ruling of the presiding Justice upon the undisputed facts was erroneous in law. And since the form of the action has been discussed under these exceptions, we add that assumpsit for money had and received is a proper form of action to recover back money paid through fraud or false pretenses, and is appropriate to the claim of the plaintiff in this case. *Emery* v. *Davis*, 17 Maine, 252; *Lord* v. *French*, 61 Maine, 420.

Lastly, the defendant complains under exception 13 of the exclusion of the deposition of one Wiley. The deposition appears to have been taken by the defendant, by a commissioner out of the State, on interrogatories filed under Rule XXIV. In the interrogatories filed by the defendant, the deponent, a competent expert, was asked if he had made any test of coal taken from the Cumberland Plateau, Tennessee, and if so, to state when, for whom, and for what purpose, what was done in making the test, and the result of the test, and to file a copy of his written report thereon as a part of

his answer to the question, and to state whether the report stated the facts truly. The report itself was not filed with the interrogatory, nor does it appear that the plaintiff had ever seen it. In the deponent's answer he stated that he had made tests but gave no details of his examination or tests, except to annex as an exhibit, as requested, a copy of his report to his employer. That report fills ten printed pages in the record, and touches many particulars and details.

We think the presiding Justice, in his discretion, R. S., c. 109, s. 20, might well have excluded the deposition on the ground that the interrogatory filed did not disclose enough of the nature of the testimony sought, fairly to enable the plaintiff to cross examine properly. But the deposition was not excluded on this ground, and we think the case shows that it was not definitely and finally excluded at all.

When the Wiley deposition was first offered, counsel stated that his purpose in offering it was to get in the exhibit, namely, Wiley's report. Objection was made that the Wiley report had never been brought to the plaintiff's attention. The presiding Justice said,— "You may omit it for the present; I will consider it," and the defendant excepted. Later on counsel for defendant offered the Wiley report, annexed to the deposition, saying, "There is additional testimony now that that report was discussed between Mr. Overton and Mr. Hotchkiss or Mr. Potter." After asking the plaintiff's counsel if the plaintiff would be called in rebuttal, and being answered in the affirmative, the presiding Justice said, — "Then I will reserve that; I will see what Mr. Hotchkiss says about his knowledge of it." Neither the deposition nor the report was offered again.

Although only the first ruling is now in question, it is apparent that on neither occasion did the presiding Justice definitely and absolutely exclude the deposition. He merely, in his discretion, excluded it for the time being. To such a ruling exceptions do not lie. In both instances the Justice wished for further light on the matter before ruling, and temporarily withheld his decision upon the admissibility of evidence offered. In such case, if counsel still

wished to introduce the evidence, he should have offered it again, or called the court's attention to the fact that a definite decision was desired.    He could thus have brought the matter to a finality, and if prejudiced by the final ruling, have had a remedy by exceptions.    The defendant can take nothing by this exception.

This disposes of all questions that have been raised in this case. And the entry must be,

*Motion and exceptions overruled.*